## Alexander, &c. *vs* Slavens, &c.                  CHANCERY.

### APPEAL FROM THE MERCER CIRCUIT.                  *Case* 97.

*Trusts.   Charities.   Bills of review.   Liens.   Parties.*

JUDGE SIMPSON delivered the opinion of the Court.         *July* 17.

    SEVERAL years since, sundry subscribers promised to   Case stated.
pay to Joel P. Williams and four other individuals, the
sums of money annexed to their names, for the purpose
of purchasing a lot of ground in the town of Harrods-
burg, and erecting thereon a suitable building for reli-
gious worship.   They constituted and appointed Wil-
liams and the other four individuals to act as trustees, au-
thorizing them to make such disposition of the amount
subscribed, as would best tend to accomplish this object.
The house when built was to be subject to the following
regulations :

    The Methodist Episcopal Church was to have the ex-
clusive use and occupation of it, for public worship, two
Sabbaths in every month, the days to be selected by that
society, and published at the commencement of each
year.

    For the balance of the time, it was to be free for the
use and occupation of every denomination of christians
who worshipped God in an orderly and peaceable man-
ner.

    The trustees, under this authority, purchased a lot of
ground in Harrodsburg, obtained the legal title thereto,
and erected on it a brick house, which was used by the
Methodist Church in that place, two Sabbaths in each
month, and by other religious denominations, when they
chose to do so, the balance of the time.

ALEXANDER, &c.
vs
SLAVENS, &c.

The fund raised by the subscription above mentioned, was insufficient to meet the expenditure necessarily incurred in the erection of the building. And even after contributions had been made to a considerable extent by others, a lien in favor of John W. Cardwell, to secure the payment of what remained due for work done upon the building, still existed on the property.

The Methodist Church became desirous of having a house of worship of their own, to be regulated and controlled by themselves. To aid them in the accomplishment of this design, they concluded to make sale of their interest in this property.

To effect this object, they appointed John Slavens and two other persons to act as a committee, and the Baptist Church in Harrodsburg appointed William Robertson and two other persons, on their part, to act for them; the one committee with full authority to sell, and the other to purchase, all the interest, rights and privileges to which the Methodist Church were entitled in the house and ground aforesaid.

Accordingly, on the 5th of November, 1840, an agreement was entered into by said committee, by which the Methodist Church sold to the Baptist Church, at the price of fourteen hundred dollars, all their interest in said property; the parties stipulating, on the one side for the payment of the price in instalments, and on the other, for a conveyance of the interest sold, by deed of general warranty.

Part of the purchase money having been paid, a bill in chancery was filed in the names of the individuals composing the committee on the part of the Baptist Church, in which the persons who acted as committee in making the sale for the Methodist Church, were alone made parties. An inability to make title, growing out of the nature of the property sold, was alledged, and a rescission of the contract asked on that ground. No answer having been filed, the bill was taken for confessed, and a decree rendered rescinding the contract, and ordering the defendants to repay the purchase money that had been paid to them.

*The first decree of the Circuit Court.*

'This bill was then filed, being a bill in the nature of a bill of review, in the names of the committee of the Methodist Church, and also of the trustees who held the title to the property, insisting on a specific execution of the contract, and making the complainants in the former suit, as well as the trustees of the Baptist Church, defendants. They alledge that the persons made defendants in the first suit, conceiving that they had no interest, personally, in the controversy, neglected to answer. That the trustees were making preparations to answer, but the cause was heard, and the bill taken for confessed unexpectedly, and irregularly, the proper parties not having been brought before the Court. On hearing, the Circuit Court decreed a specific execution of the contract, and a perpetual injunction of the previous decree. The defendants appealed from this decree, and have brought it to this Court for revision. The opposition to the decree, as well as to the compliance with the contract of purchase, seems to grow out of an honest conviction entertained by the Baptist Church, of a legal inability on the part of the Methodist Church, to invest the purchasers with the interest, rights and privileges to which they were entitled in the property.

Can the Methodist Church transfer this interest, or is it a privilege so peculiarly denominational as to render it inalienable? The general principle is, that every interest in real property, be it of what nature or description it may, is the subject of alienation. The policy of the law of this country, is opposed to fettering estates. It favors the sale and transfer of them from hand to hand, and discourages all attempts to tie them up, and clog them with limitations or restrictions which tend to impair or destroy in them this quality.

The title to this lot of ground having been vested in trustees, to hold for certain purposes, their deed to the trustees of the Baptist Church certainly conveys the legal title. The Baptist Church, under the title so conveyed, are secure against any proceedings in the common law Courts to disturb their possession, or to deprive them of the use thus acquired.

*Margin notes:*

ALEXANDER, &C. vs SLAVENS, &C.

The object of this bill.

The law of alienation of estates.

Are they equally secured against the interposition of the Chancellor, or can any of the parties interested under the deed, object to the substitution of the Baptist Church to the rights and privileges that belonged under the deed, to the Methodist Church?

The solution of this question necessarily leads to an examination of the original object and design of the contributors, by whose charitable donations the lot was purchased, and the house of public worship erected. The main object contemplated by them, undoubtedly was, to secure a place of worship for a Methodist congregation in the town of Harrodsburg, securing at the same time, but subservient to the main design, a right to other religious societies to use the house, when not occupied by the Methodist. If the sale in question had been made to defeat, or had even a tendency to defeat this original design, it might be regarded as a breach of trust, and unauthorized. But, if on the contrary, it promotes this design, if the object contemplated by the original founders of this charitable trust is more *effectually* advanced, by means of this sale, and through its instrumentality, than it would otherwise be, they have no cause to complain of it. The money arising from the sale of this property, has been, so far as it has been collected, and the remainder of it is to be, appropriated to the erection of a large and commodious house in the town of Harrodsburg, dedicated to the worship of God, and belonging exclusively to the Methodist. The contributors to this fund, so far as they desired to advance the Methodist cause, or to promote the convenience of the members of the Methodist Church in the town of Harrodsburg, must be presumed to favor a project which aids so essentially in effectuating their design. And as they evidently desired to promote the cause of religion, and to encourage other religious denominations to use the house for the purpose of public worship, this part of their design is also advanced by this arrangement. The house being no longer used by the Methodist, it can be occupied wholly by others. Every object that the donors contemplated, or desired to accomplish, will be attained, and so far as they are concerned, this disposition cannot be considered

A subscription was raised to build a house of public worship in Harrodsburg, and the fund committed to the management of certain trustees, purchase ground and build a house to be used by the Methodist Episcopal Church half the sabbaths in the month, the remaining Sabbaths by other denominations; the same trustees were authorized to sell the house after a title was acquired, to another denomination, & vest the fund in another house for the Methodist E. Church exclusively, and which was done. Held that the original subscribers could not complain, and that the trust was well performed, and the contract of sale executed.

otherwise than as entirely consistent with a provident ad-
ministration of the fund for the benefit and promotion of
the original design entertained by them.

Neither the members of the present Methodist congre-
gation, or the succeeding members of that Church in the
town of Harrodsburg, even could they be supposed capa-
ble of making the effort, would be permitted by the Chan-
cellor, in violation of good faith, and a solemn contract
on their part, to assert any claim to the property. The
privileges of other religious denominations are enlarged
and extended by the arrangement, and they could not
complain of that which operates to their advantage in-
stead of their injury.

It thus appears that no available objection to this dis-
position of the property, can be presented from any quar-
ter. By it the Baptist Church are invested with all the
rights and privileges held by the Methodist Church.
There is no impediment to their enjoyment, growing out
of the qualification annexed to the occupancy, requiring
an annual notice to be given of the Sabbaths selected for
their exclusive use. The property will be held by them
subject to the same restrictions and limitations it was
under, in the hands of their vendors. They, however,
can hereafter act in their own name, and it will be as
effectual as was the action of the Methodist Episcopal
Church in its name, during the time it was the owner of
the property.

Does the first decree between some of these parties
preclude the Court from the specific enforcement of this
contract? It cannot have this effect. The contract it-
self shows that the individuals in whose name it was
made, were not acting for themselves. They acted as
committees, representing their respective Churches. They
were in fact mere agents, the Churches for whom they
acted, were the principals. The trustees then, holding
the property for the Methodist Church were clearly ne-
cessary parties to the bill filed for a rescission of the con-
tract. The want of proper parties is a sufficient cause
for a bill of review, where, as in this instance it appears
from the record, that persons substantially interested in
the result were not made parties. This authorized the

The want of
proper parties is
good ground for
filing a bill of
review. (Mit-
ford's Pleading,
92)

ALEXANDER, &c.
vs
SLAVENS, &c.
Court to open the decree. Having done so, it was just
and equitable to decree a specific execution of the con-
tract.

If a decree is made against persons having no interest
at all in the matter in dispute, or not such an interest as
was sufficient to render the decree against them binding
upon some person claiming the same or a similar inter-
est, relief may be obtained against error in the decree,
by a bill in the nature of a bill of review. (*Mitford's
pleadings*, 92, *and the cases put by way of illustration.*)

This principle establishes the propriety of the individu-
als who made the contract, and those who acted as trus-
tees, and held the legal title to the property, joining as
complainants in the bill filed to obtain relief against this
decree, and to enforce a compliance with the terms of the
contract. It also manifests the propriety of making the
individuals who acted as a committee on behalf of the
Baptist Church in making the contract, as well as those
who were acting in the capacity of trustees for that
Church, defendants to the bill. The trustees being the
persons who were the proper representatives of the inter-
ests of the Church, had a right to apply to a Court of
Equity for a specific execution of the agreement. If the
previous decree could be regarded as forming an obsta-
cle to the relief they sought, they were justified by their
position to assail it. Not being parties, however, they
were not bound by it, and if no error had appeared in
the record, still they could have maintained an original
bill for the same purpose for which this has been prosecu-
ted, not being affected in any degree by a proceeding to
which they were not parties, and to which no persons
authorized to represent them had been made parties.

John W. Cardwell having joined in the deed to the
trustees of the Baptist Church, and having expressly
transfered and released all the interest which he had in
the property individually, his lien on it no longer exists,
and cannot be hereafter asserted to the prejudice of his
vendees.

We have not deemed it necessary to notice the act of
the Legislature of this State, authorizing the sale and
conveyance of this property. We have considered it as

*Marginal notes:*

No person is bound by a decree affecting his interest to which he was not a party.

One holding a lien upon property, who unites in a conveyance thereof to a third person, thereby waives his lien.

vendible, from its nature and character, and the disposition made of it, as entirely consistent with the views and object entertained by the original contributors.

Neither have we called to our aid, the extraordinary powers sometimes assumed by Courts of Equity, in disposing of charities by which the trust is executed, even where express directions have been given by the founder of the charity, in a mode not at all consistent with, or pursuant to his directions. Nor do we consider it necessary to intimate at this time, what the decision of this Court would be in a case of that kind. In this case, the sale is for the benefit of the charity. It promotes the design of the founders. It is not inconsistent with their views, either expressed or implied, in relation to its destined application, and consequently no legal or equitable objection to it exists.

Wherefore, the decree of the Circuit Court must be affirmed.

*Harlan & Craddock* for appellants; *Robertson & McKee* for appellees.

---

## Brown *vs* Foree, &c.

### APPEAL FROM THE SHELBY CIRCUIT.

*Fraud. Vendor. Vendee. Fraudulent sales.*

The present Chief Justice delivered this opinion on the 31st October, 1846, a few days before the end of the term, it was suspended until the— July, 1847, when the suspension was removed.

THIS action of trespass was brought by Brown to recover damages, for taking under several attachments against D. R. Johnston, divers articles of personal property which Johnston had sold and conveyed to him together with his farm, crop, stock, &c. &c.

The first and third instructions assert, in effect, that if a purchaser of property from an indebted vendor, knows at the time of his purchase, that the vendor makes the sale with the intent of thereby hindering or delaying any of his creditors from making their debts by execution, or of delaying them in the regular course of collecting their

*Margin:*

TRESPASS.

*Case* 98.

Case stated.

The fact that a vendee of property has a knowledge that the vendor, by the sale of the property, intends to hinder, delay or defraud all or any of his credi-

Brown
*vs*
Foree, &c.

tors, is not con-
clusive that the
vendee had *an
intent* to aid the
vendor in de-
frauding his
creditors, and
render the sale
fraudulent and
void.

debts by law, such knowledge furnishes conclusive evi-
dence of fraud in the vendee, and makes his purchase
void, although he may actually pay a full consideration
for the property. But the debtor himself, though he re-
sorts to a sale for the purpose of hindering and delaying
some of his creditors, may intend it as a means of pay-
ing others; and if this be so, or if the vendee has rea-
sonable grounds for supposing it to be so, the mere
knowledge that the vendor intends to hinder and delay
some of his creditors, cannot establish, or at least cannot
conclusively prove as against him any fraudulent intent.
If a sale is made with the fraudulent intent on the part of
the debtor of thereby placing both his property and its price
out of the reach of his creditors, and of thus defeating
them in the collection of their debts, it would be difficult
to avoid the conclusion, that if the purchaser, being under
no necessity to purchase, knew of this fraudulent intent,
and made the purchase without taking any means to pre-
vent its effectuation, he must be regarded as having par-
ticipated in it.

But on the other hand, the fact, if absolutely certain,
that the purchaser actually pays out of his own means,
and irrevocably, a full consideration for the property, and
especially when he secures a considerable portion of it to
the payment of the vendor's debts, in some of which he
is himself bound as surety, furnishes also a strong ground
for viewing in a favorable light his participation in the
transaction; and although it may not of itself absolutely
repel the inference of fraud, arising from his knowledge
of the vendor's intent, it has a tendency to repel it, and
should, with other circumstances, be left to the jury which
is to determine the question of fraud. At any rate, the
certainty of a fact which so strongly indicates good faith
on the part of the purchaser, should require satisfactory
proof of the opposing fact of knowledge of the fraud,
before this last fact should be taken to establish his con-
currence in the fraudulent intent. And if it can be fair-
ly assumed, upon all the circumstances, that instead of
expecting and intending that the price paid by him will
be withheld from creditors, he expected it to be paid to
them, and did not make the purchase in order to defeat

—But when the
vendee actually
pays out a full
and fair price for
his purchase, a
considerable por-
tion of which
goes to discharge
the vendor's
debts for which
vendee is surety,
these facts fur-
nish strong evi-
dence for the
conclusion that
the *intent* of the
vendee was his
own security,
rather than to de-
fraud the credi-
tors of the ven-
dor. These facts
should be left to
the jury to aid
them in deter-
mining the *intent*
of the vendee in
the purchase.

them, he should not be implicated in the fraud on the ground that he may perhaps have known of the vendor's intent, and made the purchase without sufficiently guarding against it. Men too often neglect the precautions necessary for the protection of their own immediate interests, to allow of the establishment of a principle which, in so common a transaction as that of a sale of property, would make the failure of the purchaser to impose positive and effectual guards against the possible or even probable misapplication of the price which he is paying, conclusive evidence of his concurrence in the apprehended injury to third persons. It would be too great a restriction upon the common business and traffick of men, if every or any purchase, from a debtor is to be conclusively invalidated whenever, and because a jury may afterwards, upon such view of the subject as may be presented to them, and upon comparison of probabilities, be authorized to infer that the purchaser probably knew or ought to have known that the vendor intended to defraud his creditors. These observations apply with increased force, when there is a doubt also as to the fraudulent intent of the vendor himself.

The true question in such cases is, with what motive and for what purpose did the parties make the transaction? Did the vendor make the sale with intent to defraud his creditors and as a means of doing so? Did the vendee make the purchase with intent to defraud the creditors of the vendor and as a means of aiding in the accomplishment of his purpose? We do not deny, but admit that when the fraudulent intent of the vendor and the vendee's knowledge of that intent are established, these facts, if unopposed, will authorize the conclusion that in making the purchase without protecting the interests of the creditors, the vendee gives such evidence of his concurrence in the fraudulent intent and injurious effect of the sale, as is sufficient to establish the fraud even as against him. But the question is as to his own actual intent. It is a question of fact, and is the main fact in the issue. And although it may be inferred from the other facts just stated, yet as there may be, and indeed always are other, and in different cases varying facts bearing

*The intent to defraud, by a sale of property, the creditors of the vendor and vendee, must exist with the vendee as well as with the vendor, and the sale be the means of carrying that fraudulent intent into effect. The fact of the knowledge on the part of the. vendee of the vendor's intent, is not always conclusive evidence of the participation of the vendee in that intent.*

upon the question of intent, it is inconsistent with the principles which should regulate the investigation of mere facts and the free inquiry after truth, to make one single fact, viz: the vendee's knowledge of the vendor's fraudulent intent, conclusive evidence of a similar intent on his part. This would be to change the issue, to stop in the inquiry before its real end is attained—to make a probable conclusion as to a preliminary fact absolutely decisive of the main fact in question. We think the two instructions were erroneous in requiring the jury to base a verdict against the validity of the sale, upon their belief of the single fact of the vendee's knowledge that the vendor made the sale with the intent to hinder, delay or defraud any of his creditors, or all of them, if the instructions refer to all. The policy of the law has made one fact, viz: the vendor's continuance in possession in opposition to the terms and nature of an absolute sale, conclusive evidence of fraud in both parties. But the fact of the vendee's knowledge of the vendor's fraudulent intent, does not come within the same principle or policy. And regarding it only as a fact tending more or less strongly to prove a fraudulent intent in the vendee, it should be left to the jury with other facts, and with the liberty of determining from all the circumstances, the actual intent of the vendee and the true character of the transaction.

The fourth instruction is, in our opinion, misleading and erroneous. The actual payment of the full value of the property being proven, and there being no evidence in this record from which it can be inferred, either that the vendor was to hold the price for the use of the vendee, or that the vendee was to hold the property for the use of the vendor, except so far as a small portion of the personal property as referred to in the second instruction may have remained in possession of the vendor's wife, the daughter of the vendee, the jury were not authorized to find on this fact alone, any reservation of general use to the vendor, as affecting the fairness and sufficiency of the consideration. The fact that a father purchasing all the property of his son-in-law, permits a small portion of it to remain in the house and for the use of his daughter,

though it may be, in point of law, conclusive of the void-ness of the sale, to the extent of the property thus remaining in possession of the vendor and his family, cannot determine conclusively and as to other property, the question of fact whether the vendee, in making the purchase, intended to defraud the creditors of the vendor or to aid him in the accomplishment of that object. Such a fact with regard to the possession, was not of itself and without regard to the other facts of the case, sufficient to require the conclusion that the whole sale was fraudulent and void.

If the second instruction was intended to authorize the jury to find the sale fraudulent, *per se*, and therefore void as to any of the personal property but that which remained in the use of the vendor and his family after the sale, the remarks just made upon the fourth instruction are applicable to the second, and show that in our opinion, it was misleading and erroneous. It is a harsh rule of law which declares a sale absolutely fraudulent and void merely on the ground that the vendee, with whatever motive, leaves the possession with the vendor, and it should not be extended beyond the property actually so left. Beyond this the fact should be regarded as evidence only, and to have such weight as the jury under all the circumstances, may think it entitled to.

Wherefore, the judgment is reversed and the cause remanded for a new trial in conformity with this opinion.

*Wilson* for appellant; *McHenry and Harlan & Craddock* for appellees.

---

## Brown *vs* Smith.

EJECTMENT.

ERROR TO THE SHELBY CIRCUIT.

Case 99.

*Fraudulent sales.*

This opinion, with the case preceding, was delivered on the 31st October, 1846, by the present Chief Justice Marshall, at the close of the term, and suspended until this term.

THIS was an action of ejectment by the purchaser under execution, against the prior purchaser of the same land from the debtor.

Case stated.

BROWN
vs
SMITH.

The objection made to the terms of the levy as being upon the right, title and interest of Johnston in the land, and not upon the land itself, is untenable. The distinction is but nominal and has been too generally disregarded in making levies and sales, for it to be now questioned, whether a levy and sale in either mode is not sufficient, with the Sheriff's deed, to pass to the purchaser such title as the defendant had subject to execution.

*The levy upon and sale of all the defendat's right, title and interest in land, passes the land itself.*

But the Court erred in instructing the jury "that if they find from the evidence, that the sale from Johnston to Brown was made for the purpose of hindering, delaying or defrauding the creditors of Johnston, or any of them, in the collection of their debts, the sale was void as to creditors, if Brown knew when he made the purchase, that such were Johnston's intentions; and that a consideration having passed from Brown to Johnston does not make the transaction valid, if he had such knowledge of Johnston's intentions." We do not deem it necessary to enter upon any discussion of this instruction, but refer to the opinion just rendered in the case of *Brown* vs *Force, &c.*, in which similar instructions in reference to the same sale were decided to be erroneous. The question of fraud should have been left to the jury upon all the circumstances, and not upon the isolated fact of Brown's knowledge or ignorance of a fraudulent intent on the part of Johnston, if there was such intent. The knowledge of such intent could at most, afford only a presumption of fraud on the part of Brown, sufficient to establish it, unless repelled by other circumstances. To this extent and no farther, should any instruction have been given as to the effect which the particular fact of knowledge should have in determining the question of Brown's participation in the fraud.

*The fact that a purchaser of property is apprized of the intention of the vendor to hinder, delay or defraud his creditors, is not conclusive evidence of the the same intention on the part of the purchaser; but is a circumstance to be left to the jury, that they may determine the intention of the purchaser in making the purchase.*

The instructions given on the part of the defendant did not, as is contended, correct the error in the instruction for the plaintiff just noticed. They correctly informed the jury that Brown could not be affected by the fraudulent intention of Johnston, and they must find for Brown, if he himself acted in good faith and without the fraudulent intention of aiding Johnston in hindering, delaying or defrauding his creditors, or unless he made the pur-

chase with the intention of assisting Johnston in his fraudulent purpose. But the first instruction had laid down a peremptory rule for ascertaining whether Brown did make the purchase with fraudulent intent, or at least for determining whether the sale was void or not, by telling the jury that if Johnston intended fraud and Brown knew it, the sale was void. If they believed these two facts, they could not without violating the principles of this instruction, find the fact of Brown's non-participation in the fraud, and thus the main object of the inquiry before the jury was to be concluded by the determination of a preliminary and inconclusive fact.

If upon any or all of the evidence, we could say that it was conclusively established in the whole case, that Johnston fraudulently contrived the sale for the purpose of hindering, delaying and defrauding his creditors by selling his visible property to another, and putting the price in his pocket, and that Brown, without necessity, made the purchase for the purpose of aiding him in the accomplishment of this object, which we admit his making it with full knowledge of Johnston's purpose, and without taking any means to prevent it, would tend most strongly to prove; there would, in such a state of case, be no reason for a strict scrutiny of the instructions, and no probability that the jury could have been misled by them. But as the evidence is not deemed absolutely conclusive as to either of the facts referred to, it is essential to the authority of the verdict, that the instructions should not have been of a character to mislead or even by their confliction, to confound the jury in their investigation of the facts. If it were doubtful upon comparison of the instructions which have been referred to, whether the jury may not have been misled by the first instruction, to give undue weight to the fact (as they might infer it,) that Johnston intended a fraud and that Brown knew it, we think it manifest from the subsequent course and events of the trial, that they did find their verdict under a misconception of the law.

It appears from the record, that after the case had been fully before the jury for a day or two, without their being able to agree upon a verdict, they submitted to the Court

the following interrogatory, viz: "If we should believe Brown co-operated with Johnston by making the purchase of the land in order to check the operation of the law in the action of Miss Demaree against Johnston, and yet believe it was not with a view to defraud any one eventually, must we find for the plaintiff." They had been told by the first instruction, that if Johnston intended to hinder, delay or defraud any of his creditors in the collection of their debts, and Brown knew it when he purchased, the sale was void. Their interrogatory implies that they had formed the opinion that the sale was made to hinder and obstruct the course of the legal remedy for the collection of one single debt, and that Brown co-operated in this intent, but not with a view to defraud any one eventually, and they wished to know whether, in this state of case, the sale was void. The Court responded by reiterating in substance, the first instruction, telling them that "if the conveyance from Johnston to Brown was not made with intent to delay the collection of his debts by due course of law, then there was no fraud; but that if, on the other hand, they believed that it was his intention and purpose to delay the collection of his debts by due course of law, and that Brown was aware of such intention, then the deed is fraudulent notwithstanding Johnston may have intended ultimately to pay all his debts." And the jury, shortly afterwards, returned with a verdict for the plaintiff, deciding in effect, that the deed was void.

We cannot avoid the conclusion, that the jury, under the instructions, regarded Brown's knowledge of Johnston's intent as conclusive evidence of his co-operation with it in making the purchase, and we cannot say that they would have found such co-operation to have existed, if they had not supposed that his knowledge of Johnston's intent, was conclusive on the point. But the interrogatory propounded by the jury brings into view another feature of the first instruction, by which their finding was evidently influenced. And that is the proposition, that if Johnston intended by the sale to hinder or delay the legal remedy of one creditor, this was a fraudulent intent, which if known to Brown, would, as the instruction im-

*A debtor may sell property to pay one creditor in preference to another, and a knowledge of such intention by vendee, will not vitiate his purchase.*

plies, vitiate the whole sale. Johnston had a right to prefer other creditors before Miss Demaree or any others who may have sued him. And the sale of his property before she had any lien upon it, though made with intent to prevent the effect of her suit, was not necessarily fraudulent and void, if made also with intent to pay other creditors, or all the creditors. We do not admit that a sale, intended to supply the means of paying just debts, is fraudulent and void, merely because it may also have been intended as a means of preventing one creditor from sacrificing the debtor's property, and thus preventing the collection or payment of other debts. The intent to delay certain creditors from the collection of their debts by due course of law, will not necessarily vitiate the sale, though known and so far concurred in by the vendee. If it be made also with the intent, and as the means of paying other creditors or all creditors, and if it be upon terms reasonably calculated to answer that purpose in a satisfactory manner, and to the extent of the value of the property, it would seem unreasonable to condemn it, merely because it may have been intended by the grantor to obstruct some of the creditors in the legal coercion of their debts, although this intention may have been known to the grantee. In this case, more than one third of the consideration of the purchase, was by the terms of the sale, secured to certain creditors of Johnston, by the assumption of Brown to pay their demands, in the greater part of which he was security. To this extent, therefore, he stood substantially as a creditor, and as such, had to that extent at least, a lawful motive and inducement to enter into a purchase of Johnston's property. And although this circumstance may not conclusively determine the character of the purchase as being free from fraud, it tends to show that it was made with a different motive, and should exempt it from the peremptory denunciation made against it by the instructions under review. It is not absolutely certain, though probable, that Brown had heard of Miss Demaree's suit when he made the purchase. But if he did know it, and also knew and intended to defeat the effect of the suit, as a remedy for coercing the debt by a sale under execution, there is neverthe-

less evidence, from which the jury might have found, as the terms of their interrogatory indicate, that they believed that the payment of that debt, though not secured by the sale, was in truth one of the objects intended, at least by Brown, who mentioned it as a debt to be paid. It appears too, that about two thirds or more of the consideration of the sale were in fact appropriated by Johnston for the payment of his debts, and that an arrangement for discharging the demand of Miss Demaree, by means of another portion of the consideration, and without probable loss to her, was proposed by him. He says that when he made the sale, he did not know the extent of his indebtedness, but supposed the sale would enable him to pay his debts, which he intended to do, and have something left. It appears too, that Brown actually furnished from his own means, a full consideration, amounting to dbout $6,500 for the property conveyed, and that Johnston had previously made various unsuccessful efforts to sell his land, in which Brown had aided him, and presumably for the purpose of paying his debts by the sale of his property, which Johnston says was his object in making the actual sale.

These circumstances, with others which need not be enumerated, tend to show that the sale was not intended ultimately to defeat any of Johnston's creditors, but that it may have been intended as a means of raising money to pay them. This inference was not conclusively repelled by Johnston's subsequent appropriation of a portion of the price to other uses, leaving a portion of his debts unpaid. But the jury seem to have believed that the sale was intended by both parties, to obstruct the legal remedy for the collection of Miss Demaree's debt, and as the instructions of the Court imply that believing this fact, they were bound to find the sale fraudulent and void, though they might believe that it was made for the purpose of paying the debts of Johnston to the full extent of the consideration, the verdict can only be regarded as establishing the fact, that the sale was intended to obstruct the collection of Miss Demaree's debt, without negativing the fact that it was also intended as a means of paying debts to the extent of its value, even including

that of Miss Demaree. If it was so intended, it was not in our opinion, conclusively fraudulent and void, even as against Miss Demaree.

The answer to the interrogatory put by the jury, should have been, that upon the facts stated therein, they were not bound to find for the plaintiff, unless they believed that both parties to the sale intended at the time that the consideration should be withheld from Johnston's creditors; or that they were not bound to find for the plaintiff if they believed that the intent of Brown in making the purchase, was that the price should be appropriated to the payment of all of Johnston's debts, or as far as it would go.

As our object has been merely to consider the principles involved in the instructions, we have referred to the evidence only so far as to show that the jury may have been misled by the instructions, and we only decide that upon the facts assumed in them the jury was not bound to find for the plaintiff. The witnesses objected to by Brown had no direct interest in the event of this suit, and the record could not be used as evidence for or against them in the suit brought by Brown against them, *for taking* under attachment a part of the personal property conveyed by the same deed now in question. They were, therefore, not incompetent, but their interest in the question would properly go to their credit. In overruling the objection as taken to the competency of the witnesses, the Court might, and if required, should have told the jury that the interest of the witnesses in the question, was a circumstance which, in the estimation of the law, might affect their credit, but that it was for the jury to determine for themselves how far, if at all, this bias may have affected the testimony of the witnesses, and how far their statements were to be believed as true. As the Court was not requested to instruct the jury on this subject, the omission to do so cannot be complained of.

The question how far the acts of Johnston, after the conveyance to Brown, should bear upon the question of fraud, was not made nor decided in the Circuit Court.

For the errors in the instructions as above indicated, the judgment is reversed, and the cause remanded for a new trial, on principles consistent with this opinion.

KENDALL
*vs*
HUGHES.

*Cales & Lindsey and Loughborough* for plaintiff; *Harlan & Craddock, McHenry and Duncan* for defendant.

DETINUE.

## Kendall *vs* Hughes.

*Case* 100.

APPEAL FROM THE HANCOCK CIRCUIT.

*Fraud, statute of.*

*Nov.* 2, 1846.

This opinion, with the two cases preceding, was delivered et the fall term, 1846, by the present Chief Justice, at the close of the term, and suspended until this term.

Case stated.

THIS action of detinue was brought by Hughes against Kendall, to recover two slaves, a woman and her infant child, which Kendall had purchased under executions against John L. Prewitt the former owner, the father-in-law of Hughes; and the sole question involved in the trial was, whether the bill of sale under which the plaintiff claimed these and other slaves, was fraudulent and void against creditors. Seven instructions were given as moved for by the plaintiff, and five as asked by the defendant, except that two of these last were modified by the Court, as will be presently stated. And the jury having found a verdict for the plaintiff, which the Court refused to set aside, the defendant brings the case to this Court.

Of the evidence we need not present a detail. It was of such a character as to authorize and require a strict scrutiny of the instructions in order to sustain the verdict.

Instructions of the Circuit Ct., given at the instance of each party.

Several of the instructions assume hypothetically that J. L. Prewitt made the sale with the intent of defrauding his creditors thereby, and that this intent was known to Hughes at the time. The Court properly instructed the jury as moved for by the plaintiff, that the fraudulent intent of Prewitt could not affect him, unless he participated in it at the time of the sale. And the instructions asked for by the defendant, to the effect that if Hughes made the purchase, knowing the fraudulent intent of

Prewitt, it was void, and they must find for the defend-
ant, was properly refused in the terms in which it was
asked.

For such knowledge in the purchaser was not in itself
conclusive evidence of his participation in the fraud, so
as necessarily to make the sale void without regard to
other circumstances: *Brown* vs *Foree, &c. and same* vs
*Smith, (decided at the present term.)* It may be that by
the refusal to give these instructions as asked, and by so
modifying them as to require as an additional condition
essential to the conclusion that the sale was void, that
Hughes should have made the purchase, to favor or fur-
ther the fraudulent object of Prewitt, the jury may have
been misled into the supposition that his knowledge of
the fraudulent intent, was not alone sufficient evidence of
his participation in it. But certainly the purchaser's
knowledge of the vendor's fraudulent intent in making
the sale, affords a presumption of his participation in that
intent, which will authorize the conclusion that he did so
participate, unless the inference be repelled by circum-
stances tending to show that he had sufficient lawful in-
ducement to make the purchase, or that he took precau-
tions against the intended consequences of the sales, or
unless in some other way, the inference is repelled by
the facts of the case. It is true that the purchaser must
make the purchase to favor or further the fraudulent in-
tent. But his knowledge of the intent tends to prove that
he did make the purchase to favor or further it, and is
sufficient unless this inference be repelled by the other
facts. The jury, under the circumstances above stated,
may have supposed that it was insufficient to authorize a
verdict against the sale, unless some other fact were es-
tablished tending more directly to prove a design on the
part of Hughes to favor or further the fraudulent object of
Prewitt. If, therefore, the Court, after declining to in-
struct the jury as asked by the defendant, thought proper
to instruct them in his own language as to the effect of
the purchaser's knowledge of the vendor's fraudulent in-
tent, it would have been more safe to instruct them that
upon these facts they might find the sale void, and should
do so unless from other circumstances or under all the

KENDALL
*vs*
HUGHES.

The knowledge
of a purchaser
that the vendor
of property in-
tends to defraud
his creditors,
does not *in all
cases,* of itself,
render the sale
fraudulent as to
creditors and
purchasers; but
it creates a pre-
sumption of a
fraudulent parti-
cipation, which
will authorize
the conclusion,
unless repelled
by other facts
and circumstan-
ces showing a
lawful induce-
ment to the pur-
chaser.

facts, they believed that Hughes did not participate in the fraudulent intent of Prewitt, or did not make the purchase with a view to favor or further that intent. It is not necessary in this case to decide whether the modification actually made, would alone be sufficient ground of reversal.

The instruction No. 3, given for the plaintiff, that the fraudulent intention cannot be presumed, but must be proved like any other fact, is obviously misleading. Fraud or any other fact may be presumed, if there be sufficient evidence of other facts which authorize the inference of fraud.

*To instruct the jury "that fraud cannot be presumed, but must be proved like any other fact," decided to be misleading.—— Fraud may be presumed if there be sufficient evidence of other facts which will authorize the inference of fraud.*

The 6th instruction, to the effect that when two persons live on the same place, the possession in law of slaves, is in the person having the legal right to them, if true in the terms in which it was given, could have little bearing on the case, unless to authorize the inference by the jury, that as the bill of sale transferred the legal right it also transferred the possession; whence they might also infer that no further change of possession was necessary to make the sale effectual, (so far as possession was concerned,) against all persons. This instruction was calculated to mislead. The principle of law by which the legal title to personalty, *prima facie* and constructively, draws to itself the possession, and under which the sale of personalty in the same house with vendor and vendee, may be complete and pass the possession in law without any actual manu tradition, if applicable at all to a case involving the question of fraud, has no legitimate operation in a case where the parties in fact live separately, and the vendee leaves the property in the ostensible possession of the vendor. It amounts to nothing more in such a case that as between vendor and vendee, the title passed without actual delivery of possession. But in the question of fraud, the *actual* possession cannot be disregarded. The instruction as given, tends rather to confuse a jury and to obscure the real question in issue.

*As between vendor and vendee, the title passes by sale without actual delivery of possession; but in cases involving the question of fraud, it cannot be disregarded.*

And of similar tendency is the first instruction which tells them that if they find the slaves to be the property of the plaintiff, they must find for him. The slaves were

*In questions involving the question of fraud in*

his property as against all the world except creditors, and against them unless the sale was fraudulent. The sixth instruction tells the jury "that if Hughes, in good faith, purchased the slave, Harriet, (the mother of the infant born after the sale,) from J. L. Prewitt, who delivered the possession of her to the plaintiff, and he placed her in the possession of Wm. F. Prewitt for hire, in law the possession was in the plaintiff, and the fact that J. L. Prewitt lived on the same place with Wm. F. Prewitt, did not make the latter an improper person to take possession of the slaves, if the transaction was otherwise fair and *bona fide.*" The fact as proved was, that Wm. F. Prewitt was a minor, living in the same house with his father, J. L. Prewitt; that some months before the sale of the slaves, J. L. Prewitt had assigned to him, (without the knowledge of the neighborhood,) the bond which he held for the title of the land on which he lived, taking his note for the price; that Wm. F. also promised to support his father and family, and continued as before, to manage the farm and control the laborers, and that there was no ostensible change either after the assignment of the bond or after the sale of the slaves to Hughes.

We think then, that this sixth instruction is liable to the objection that it rather colors or assumes too strong, the facts with regard to the residence of the Prewitts, and also to the objection that it introduces, with probable misleading effect, the principle of constructive possession before referred to. True, the whole is qualified by the condition that the jury should find that Hughes purchased, in good faith, and that the transaction, irrespective of the possession, was fair and *bona fide.* We do not know precisely what idea was conveyed to the jury by the words expressing this condition. The instruction, however, seems to imply that the jury might determine the question of fraud without looking to the state of the possession, and that unless without regard to that fact, they should find the sale fraudulent, the circumstance that the possession was left with Wm. F. Prewitt, was immaterial, or that this was in fact, a sufficient change of the possession to answer the requisition of the law. But certainly there was no such conclusive evidence of good faith

KENDALL
vs
HUGHES.

a purchaser in the sale of property, to instruct the jury, "that if they find the slaves to be the property of the plaintiff——they should find for him," is misleading, they may be the property of plaintiff against all the world except creditors and purchasers as to whom the plaintiff may not be entitled to recover.

Instructions to the jury should not assume facts which it is the province of the jury to decide, but be hypotheticated upon their belief from the evidence of the fact supposed; and should not conclude that plaintiff is authorized to recover upon their belief from the evidence, of part only of the facts necessary to authorize the recovery.

KENDALL
vs
HUGHES.

or of the absence of fraud as authorized the exclusion of the fact of possession from the consideration of that question. Where the question of fraud is an open and doubtful question of fact, the state of the possession is in all cases, entitled to influence and must be considered in determining the question. In many cases it is itself conclusive of fraud, and is so in the present case, if the formal change of possession was colorable only. And if it were not, the state of the possession was still a circumstance tending to give character to the transaction, and which, therefore, could not properly be excluded in inquiring into its character. The instruction was misleading and erroneous in authorizing its exclusion. The leaving of the possession with Wm. F. Prewitt, under the circumstances, authorized unfavorable inferences as to the motives of the purchase, and he was, therefore, in view of this inquiry, an improper person to receive it, and especially when the requisite publicity and certainty with regard to the fact and objects of his possession were not secured, but the possession was left in such a condition as might deceive and impose upon others.

A vendee left slaves in the possession of a son of vendor, a minor, on the same farm. Held that the acts of the vendor in regard to the property, might be considered by the jury in determining the character of the transaction.

The 5th and 7th instructions for the plaintiff speak of declarations of ownership by J. L. Prewitt after the sale, and of occasional directions by him to the slaves after they were delivered to Wm. F. Prewitt. The 5th informs the jury that such declarations were not evidence of fraud, &c., and the 7th informs them that if the jury believe from the evidence that Hughes purchased the slaves in good faith, and delivered them to Wm. F. Prewitt to keep for him, occasional directions to them by J. L. Prewitt while living in the same family with Wm. F., were not inconsistent with his possession and right, so as to constitute the transaction fraudulent, if otherwise it was fair and *bona fide.* Here again the facts as indicated in the instruction, do not properly characterize the real facts to which they probably intended to relate. J. L. Prewitt seems to have mortgaged some of the slaves after the sale, appropriated the hire of others, and received the proceeds of the labor on the farm. He concealed the slaves when the officer came to levy the execution, and

Wm. F. Prewitt, though present, and applied to for aid by the officer, intimated no agency on his part, or claim on the part of Hughes. At least the evidence conduces to prove these facts. But besides this, it is to be remarked, that as the plaintiff's case rests upon the assumption that he left the slaves with Wm. F. Prewitt as his agent or trusted bailee, his own ignorance of the declarations and acts of J. L. Prewitt in his absence, does not necessarily prevent them from being evidence against him, if they were known to his agent and acquiesced in by him. And further, by leaving the possession with a minor in J. L. Prewitt's family, after he had made an absolute purchase, and without giving notoriety to his own title and to the possession of Wm. F. Prewitt, he put it in the power of J. L. Prewitt to continue his acts of ownership and control, by which others were deceived, and his title must be subject to the inferences arising from the subsequent declarations and acts of J. L. Prewitt in connection with the property. They in fact characterize the state of the possession after the sale, constitute a part of it, and in enquiring into the real intent of the parties, these facts must be considered with others which tend to elucidate the transaction. We are of opinion therefore, that the 5th and 7th instructions, in their application to the actual case, were misleading and erroneous.

Cates & Lindsey and J. C. Walker for appellant; Harlan & Craddock for appellee.